Argued and submitted November 26, 2002, affirmed January 29, petition for review denied May 28, 2003 (335 Or 443)

# STATE OF OREGON,
*Respondent,*

*v.*

# CELERINO AVILA PEREZ,
*Appellant.*

### 994733; A110420

61 P3d 945

David C. Degner, Deputy Public Defender, argued the cause for appellant. With him on the brief was David E. Groom, Acting Executive Direction, Office of Public Defense Services.

Rolf C. Moan, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Armstrong and Brewer, Judges.

BREWER, J.

## BREWER, J.

Defendant, a police informant, was convicted after a jury trial of four drug offenses arising out of his use, as the location of a methamphetamine operation, of a motel room provided to him by the police at public expense. Defendant appeals from the trial court's imposition of an upward durational departure sentence of 36 months' imprisonment on his conviction for manufacture of a controlled substance. He asserts that the court erred in relying on his alleged use of a weapon and a purported violation of a public trust as aggravating factors justifying the departure sentence. We review to determine whether the court's findings of fact and reasons justifying the departure are supported by evidence in the record and constitute substantial and compelling reasons to depart as a matter of law. ORS 138.222(3). We affirm.

Beginning in March 1999, for a period of six months, defendant cooperated with interagency drug enforcement teams in Lincoln and Marion counties as an undercover agent purchasing illegal drugs from suspected drug dealers. Defendant was paid certain benefits for his work as an informant. His supervising officer, Oregon State Police (OSP) Detective Meister, testified that "we pay [informants'] expenses, maybe gas expenses if they have a car or to use the phone or something like that, and then we will compensate them [for] various success in whatever case we're working." Under OSP guidelines, defendant was required to sign an agreement that governed his undercover activities. That document, executed on March 25, 1999, provided that defendant would "assist the [OSP] in the investigation of the criminal violations occurring in Oregon," and it included the following terms:

> "I am fully aware that I may have to testify in future court proceedings concerning cases in which I might participate. I have entered into this agreement freely and without duress. I fully understand that I am not to participate in any investigations of any criminal activities, unless the investigation[ ] is being directly supervised by a sworn member of this Department. I agree to follow the instructions of the supervising officer while assisting in such investigations. I agree that any compensation paid me with

respect to any services rendered by me in connection with any such investigation shall be the full and complete payment for those services."

On the same date, defendant also signed a confidential questionnaire, in which he answered "Yes" to the following questions:

"1.  Do you understand that you are not privileged to break any laws during the course or [sic] providing any services for this Department?

<u>Yes</u>

"* * * * *

"7.  Do you understand that you are not to use your services for this Department to resolve personal matters?

<u>Yes</u>"

On six separate occasions defendant successfully purchased illegal substances from suspected drug dealers in controlled buys directed by Meister. In addition, defendant executed an affidavit that assisted police in Marion County in obtaining a search warrant that resulted in the recovery of controlled substances and a criminal prosecution. Although defendant was not specifically identified in the search warrant application, Meister testified that the information he had provided was "put together in a way that it could be figured out who [defendant] was."

On September 26, 1999, defendant told Meister that two men had just tried to shoot him and his nephew at a state park in Waldport. Defendant stated that one of the assailants said, "[Y]our time has come" and, "[T]his is from Alvaro." Defendant previously had identified "Alvaro" as "a major drug dealer in the Portland area." Meister initially believed defendant's account. Meister testified that he felt that, under the circumstances, the police were responsible for defendant's safety. As a result, the Lincoln County Interagency Narcotics Team (LINT) paid for a motel room in Newport and placed defendant in that room. On September 30, LINT officers moved defendant to a different motel because he had reported seeing people who were aware of the encounter at

the state park and of whom he was afraid. LINT paid for that room as well.

During the same time period, Meister received information leading him to believe that defendant had not been truthful about the purported encounter with Alvaro's henchmen. Meister confronted defendant, who then admitted that he had lied about the encounter at the park and said, instead, that it had resulted from a prearranged exchange of drugs. The police had neither sanctioned nor arranged for such an exchange. However, defendant persisted in his account that Alvaro's men had tried to kill him.[1] Defendant told Meister that, after the attempt on his life, he ended up in possession of the drugs involved in the exchange. Defendant admitted that he had a large quantity of drugs in the motel room where he was staying. He signed a consent form authorizing the police to search his room. The officers seized 14 individual bags of methamphetamine from the room with a total weight of 427 grams. Spinney told the police that she had observed defendant use one of her steak knives to cut a brick of methamphetamine into pieces that he and another accomplice, Chavez, put into plastic baggies.

The jury convicted defendant of possession, delivery, and manufacture of a controlled substance, and it also convicted him of delivery of a controlled substance to a minor. The trial court imposed a durational departure sentence of 36 months' imprisonment on the delivery conviction and imposed concurrent sentences on the convictions for possession and delivery of a controlled substance to a minor. The court also imposed a consecutive 36-month durational departure sentence on the conviction for manufacture of a controlled substance. In making the departures, the court relied on separate findings that defendant's crime involved the "use of a weapon," OAR 213-008-0002(1)(b)(E), and that "the offense involved a violation of public trust." OAR 213-008-0002(1)(b)(F).[2] The court reasoned:

---

[1] One of defendant's accomplices, Spinney, told the police that she had observed the encounter and that, contrary to defendant's revised story, defendant and a companion had held the other two men at gunpoint.

[2] OAR 213-008-0002 provides, in part:

"(1) Subject to the provisions of sections (2) and (3) of this rule, the following nonexclusive list of mitigating and aggravating factors may be considered

"[Meister] is a veteran police officer, one skilled in investigating illegal drug transactions. [Meister] trusted the defendant because the defendant had proven himself to be reliable in terms of information provided and in terms of a willingness to undertake personal risk, which is involved when you make a controlled buy from people who pack guns * * * and that he was willing to undertake those personal risks to further the cause of law enforcement.

"A person does not have to be a public employee to violate a public trust. [Defendant] had spoken to Meister before about Alvaro as being a person deserving of great scrutiny by the police. Although Meister had not authorized [defendant] to undertake any private enforcement action, [defendant] had baited the hook with Alvaro's name and reputation and Meister bit.

"* * * * *

"* * * [Defendant] told the made-up story about being the object of an assassination attempt at Alvaro's hands in light of [defendant's] somewhat disclosed role in Salem as an undercover drug informant. The Manufacturing of Controlled Substance offense was committed in a motel room paid for by Oregon's taxpayers courtesy of [Meister's] concern for the safety of the defendant and Mr. Chavez from the would-be assassins who were still at large.

"[Defendant] preyed on the trust that Meister had given him and thereby secured the private room in which the Manufacture of the methamphetamine occurred. Specifically, the funds that paid for the motel room came from the local police budget that's dedicated to help capture people engaged in unlawful drug activity. While the manufacture could have occurred anywhere, the fact is that it occurred in a location made possible by [defendant's] breach of the trust, the public trust that had been given to him only

---

in determining whether substantial and compelling reasons for a departure exist:

"* * * * *

"(b) Aggravating factors:

"* * * * *

"(E) Use of a weapon in the commission of the offense.

"(F) The offense involved a violation of public trust or professional responsibility."

because of his duplicity and cunning over the course of six months of dealings with Meister.

"It wasn't just a matter of the taxpayers providing lodging. The taxpayers provided a secret location at which the crime of Manufacture of a Controlled Substance could occur. A secret location in a different town than where [defendant] lived. The defendant knew that Alvaro would not like what happened.

"[Defendant] testified that he feared for his family's safety in Washington County but he didn't make any phone calls to do anything about that. What [defendant] really feared was [Alvaro's] henchmen coming to Waldport to find him. The defendant was so apprehensive that he even reported some bad guys who might have been scouting the first motel room, so he got Meister to get him a second motel room at a different place. [Defendant] sought and got a secure location to consolidate the proceeds of the Robbery by a breach of the public trust.

"Without the trust he had gotten from Meister, [defendant] and his gang would not have gotten a lodging through Meister and the Lincoln County Drug Team funds. The defendant argues that he was afforded protection as a crime victim. He wouldn't have gotten the protection he did had he not had the relationship with Meister that he did."

The court also found that defendant's work as an informant had been motivated by deceit from its inception:

"[Defendant] had purposely earned the reputation as a trusted informant for two very selfish reasons. First, he wanted to know who the local undercover drug cops were and how they operated so he'd know what to look out for. Second, he wanted to get on the good side of the police so he could have an escape hatch, a plausible reason for being involved in drug trafficking in case he ever got caught in the criminal enterprise that he was in the process of creating and masterminding. If exposed, he wanted to be able to try to convince [Meister] and the other drug police that he was acting to further some legitimate undercover detective work of his own."

With respect to defendant's use of a steak knife to cut the methamphetamine, the court said:

"The second aggravating factor for this crime is the use of a weapon. * * * [OAR 213-008-0002(1)(b)(E)] does not say that a person must intimidate another person with a weapon or slash out at another person with a weapon or cause injury with a weapon in order for the aggravating factor to apply.

"The defendants used a knife to manufacture the methamphetamine. The factor applies."

Defendant appeals from the ensuing judgment in which the trial court imposed a durational departure sentence on his conviction for manufacture of a controlled substance. That conviction fell into gridblock 8-I of the sentencing guidelines grid, carrying a presumptive range of 16 to 18 months' imprisonment. The court could impose a durational departure sentence of up to double the maximum presumptive prison term only upon finding substantial and compelling reasons to depart. OAR 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. Defendant argues that neither of the factors on which the trial court relied was sufficient to justify the durational departure sentence it imposed. The state concedes that the trial court erroneously applied the "use of a weapon" factor, but it argues that the trial court's independent finding that defendant violated a public trust justified the departure sentence.

■   At the outset, we accept the state's concession that the trial court erred in applying the "use of a weapon" factor to justify a departure sentence. Defendant used a steak knife to cut methamphetamine. Although the knife could be used as a weapon, defendant did not use it to threaten or injure anyone. In *State v. Harris*, 174 Or App 105, 25 P3d 404 (2001), we considered a sentencing court's authority to impose a gun minimum sentence under ORS 161.610(2), based on the "use or threatened use of a firearm * * * during the commission of a felony." The defendant had threatened to "beat the victim with the rifle." *Harris*, 174 Or App at 107. We applied ordinary statutory construction methodology to determine the meaning of "use," a word that the legislature had not defined. Although "use" has several possible meanings, we concluded that statutes concerning weapons tend to employ the term narrowly. *Id.* at 110. We rejected the state's argument that "use of a firearm" refers to "*any* use for *any* purpose." *Id.* at 112 (emphasis in original). We concluded

that use or threatened use of a firearm refers "to discharge or threatened discharge." *Id.* In the absence of evidence that the "defendant discharged or threatened to discharge" the rifle, we held that no gun minimum could be applied, despite the fact that the defendant had threatened to use the rifle as a club. *Id.* at 113.

By force of similar reasoning, although the legislature has not defined "use" for sentencing guidelines departure factor purposes, it makes little sense to conclude that it intended to authorize departure sentences for "use" of a weapon as something other than a weapon. Because defendant's use of the steak knife did not satisfy that definition, the trial court improperly relied on that departure factor in imposing sentence.

■ However, as noted, the court found that defendant's violation of a public trust constituted a "separate and distinct basis" for departure. Accordingly, the court's imposition of a departure sentence is subject to affirmance unless the court also erred in concluding that defendant's offense involved the violation of a public trust. *State v. Wolff*, 174 Or App 367, 371, 27 P3d 145 (2001). We turn to that issue.

Defendant advances three arguments in support of his contention that the trial court erred in concluding that his crime involved the violation of a public trust. First, he contends that, in his role as a police informant, he was a mere "stool pigeon" and that there was no evidence that "the police at any time placed any special trust in [him] because of his volunteer work as an informant." Second, defendant contends that, even if the police did trust him, that trust did not constitute a public trust within the meaning of OAR 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(1)(b)(F). Third, defendant asserts that, because the crime of manufacturing a controlled substance could have been committed "anywhere," there was nothing about the offense itself that indicated defendant used or took advantage of any public trust in order to commit it.

■ Defendant's first argument challenges one of the trial court's findings of fact. Contrary to defendant's characterization of his relationship with the police, the trial court found that defendant was "a trusted informant, an agent of

the police in this county." That finding is supported by evidence in the record. Defendant explicitly agreed to assist law enforcement officials in exchange for specified benefits and, in doing so, to comply with certain restrictions and obligations. Until he was apprehended, defendant earned the trust of the police by engaging in six controlled buys and in helping secure a search warrant that led to a criminal prosecution in Marion County. In doing so, he risked his own personal safety. That evidence supports the trial court's finding that defendant was a trusted police agent.

Second, and alternatively, defendant argues that the trust that the police placed in him was insufficient as a matter of law to constitute a *public* trust. He relies on our decision in *State v. Reid*, 140 Or App 293, 296-97, 915 P2d 453 (1996), for the proposition that, as used in OAR 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(1)(b)(F), the term "public trust" is limited to the traditional concept of abuse of authority by a public official. Defendant misunderstands the holding of *Reid*. In that case, the defendant was convicted of several crimes involving the sexual abuse of his 12-year-old daughter. The trial court imposed an upward departure sentence based in part on its finding that "[a]ll human beings deserve to be treated with respect by all other human beings, and particularly children and particularly your own children." *Id.* at 297 n 3. We agreed with the defendant that the reasons the court gave for departure did not support a finding that the defendant had violated a public trust. We noted that the commentary to the rule furnishes the following example of its application:

> "EXAMPLE: A local government employee who has been appointed to serve as a trustee on behalf of a number of elderly clients embezzles funds from the trust accounts. This offender has violated not only this trust relationship with the victims, but has also abused the authority vested in him as a public servant. Consequently, an aggravated sentence would be appropriate."

*Id.* at 296 n 2 (quoting Oregon Sentencing Guidelines Implementation Manual 131 (1989)). In rejecting the trial court's reasoning, we explained:

> "At the time the legislature enacted OAR [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(1)(b)(F)], it had before it the commentary. That commentary indicates that the factor was meant to capture the

'traditional' concept of public trust, as defendant argues. However, the state is correct that a sentencing court is not limited to the listed aggravating factors in imposing departure sentences. Nonetheless, if a *court, in referring to* breach of a 'public trust' as a basis for departure intends to expand the traditional understanding of 'public trust,' it must define the scope of the 'trust' and explain why it is properly viewed as 'public' rather than private. In all events, a court cannot simply denominate as a 'public trust' the expectations that society has about how its members should behave toward each other."

*Reid,* 140 Or App at 296 (footnote omitted).

In this case, defendant was not a public servant in the ordinary sense. His undertaking was limited in scope and may not have fit into the "traditional" concept of a public trust as illustrated by the guidelines commentary and as elaborated on in *Reid.* Even so, by carefully defining the trust that defendant violated in a manner demonstrating the "public"—that is, the quasi-official—nature of that trust, the trial court satisfied the criteria described in *Reid* for an expanded conception of a public trust. The trial court explained that defendant had agreed to assist law enforcement officials in the performance of law enforcement activities and that, after engaging in those endeavors for some time, defendant violated the trust that those officials had come to place in him by lying about the purported assassination attempt. In turn, that deception led to defendant's placement in a motel room at public expense, where he engaged in additional conduct that was contrary to his agreement with those officials.

The court's findings more than adequately demonstrate that the trust reposed in defendant properly can be characterized as "public." The court emphasized defendant's status and activities as a trusted agent of publicly employed police officers, and the fact that the room in which defendant carried out his crime was rented as a consequence of defendant's engagement in that capacity, as well as at public expense. Conversely, nothing in the trial court's findings reasonably can be viewed as describing circumstances that commonly occur among private persons carrying out private endeavors. Stated another way, the court did not rely on defendant's conduct of manufacturing methamphetamine or,

more generally, violating the law—conduct that, when carried out by a private person, does not violate a public trust for the purpose of OAR 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(1)(b)(F). Rather, the trial court relied on defendant's having engaged in that conduct despite, and contrary to, his agreement to act as the agent of the police officers and his doing so, moreover, at public expense. We conclude that the trial court adequately defined the scope of the trust at issue in this case and explained why it is properly viewed as public rather than private.

■■    We briefly consider defendant's third and final argument, namely, that because his crime could have been committed "anywhere," nothing about its commission in the motel room provided by the police indicated that he used or took advantage of any public trust. That argument is directly contrary to the trial court's findings of fact. The court found "that [defendant's crime] occurred in a location made possible by [his] breach of the trust, the public trust that had been given to him only because of his duplicity and cunning over the course of six months of dealings with Meister." The court also found that defendant "sought and got a secure location to consolidate the proceeds of the Robbery [of Alvaro's henchmen] by a breach of the public trust." Evidence in the record supports each of those findings, and they foreclose defendant's argument. Even though defendant could, indeed, have manufactured methamphetamine somewhere else, he chose to commit his offense at a location that he secured through his breach of a public trust. Under those circumstances, the trial court did not err in imposing a departure sentence.[3]

Affirmed.

---

[3] Although it is not entirely clear, defendant's argument may reflect a misunderstanding of the relationship between the elements of an offense and the particular circumstances of its commission that justify a departure. A factual aspect of a crime that is a statutory element may not be used as an aggravating factor to support a departure unless "the criminal conduct constituting that aspect of the current crime of conviction is significantly different from the usual criminal conduct captured by the aspect of the crime." OAR 213-008-0002(2). For that reason, aggravating factors usually are *not* captured by a statutory element of the crime of conviction. Accordingly, the fact that the location at which defendant manufactured methamphetamine is not an element of the crime he committed does not establish that that location is immaterial to the determination of whether the crime involved a breach of a public trust.